

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-2-1994

# Dupont v. Com. IRS

Precedential or Non-Precedential:

Docket 94-7242

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Dupont v. Com. IRS" (1994). *1994 Decisions.* Paper 206.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/206

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 94-7242, 94-7243 & 94-7244
_____


E.I. DU PONT DE NEMOURS & COMPANY,
  and Affiliated Corporations,
                        Appellant in No. 94-7242

        REMINGTON ARMS COMPANY, INC.,
                        Appellant in No. 94-7243

        E.I. DU PONT DE NEMOURS & COMPANY,
    Successor to New England Nuclear Corporation,
                        Appellant in No. 94-7244

                        v.

        COMMISSIONER OF INTERNAL REVENUE SERVICE

_____

        On Appeal from the United States Tax Court
                    Washington, D.C.
        (Tax Court Nos. 91-19950, 91-19952 & 91-19953)
                _____


        Argued September 29, 1994

Before:  SCIRICA, NYGAARD and McKEE, Circuit Judges

        (Filed December 2, 1994)


                        JOHN L. SNYDER, ESQUIRE (Argued)
                        MICHAEL R. SCHLESSINGER, ESQUIRE
                        BRADFORD L. FERGUSON, ESQUIRE
                        MARILYN D. FRANSON, ESQUIRE
                        Hopkins & Sutter
                        Three First National Plaza
                        Suite 4200
                        Chicago, Illinois 60602

                        Attorneys for Appellants

THOMAS J. CLARK, ESQUIRE (Argued)
GARY R. ALLEN, ESQUIRE
GILBERT S. ROTHENBERG, ESQUIRE
United States Department of Justice
Tax Division
P.O. Box 502
Washington, D.C. 20044

Attorneys for Appellee

_____

OPINION OF THE COURT
_____

SCIRICA, <u>Circuit</u> <u>Judge</u>.

In this appeal, we must determine the validity of Treas. Reg. § 1.58-9 (1992).  Specifically, the issue is whether the Department of the Treasury may implement a "suspended-tax" approach instead of a "suspended-preference" method in calculating minimum tax under the "tax benefit rule" of former I.R.C. § 58(h), 26 U.S.C.  The first approach computes and suspends tax liability until a benefit results while the latter suspends items of tax preference.  Because we find the suspended-tax approach to be a reasonable construction of § 58(h), in accord with its language and purpose, we will uphold the regulation.

I.

E.I. du Pont de Nemours & Company, Conoco, Inc., Remington Arms Company, and New England Nuclear Corp.[1] filed

_____

[1].      New England Nuclear Corp. (NEN) merged into DuPont after the 1981 taxable year, the year of the alleged deficiency against NEN.

federal income tax returns for 1979, 1980, and 1981,[2] claiming

reductions in tax liability through the use of income tax credits

carried back from the 1982 tax year.  Subsequently, the Internal

Revenue Service issued notices of deficiency to taxpayers for

$25,633,133.  Taxpayers responded by filing petitions in the Tax

Court, contending the regulation on which the deficiencies were

based exceeded the scope of the authorizing statute, I.R.C. §

58(h).[3]  The Tax Court sustained the regulation, E.I. Du Pont De

Nemours & Co. v. Commissioner, 102 T.C. 1 (T.C. 1994), and

taxpayers appealed.[4]  We will affirm.

A.

In 1969, Congress enacted I.R.C. § 56(a) out of concern

over the use of tax deductions and exemptions that enabled some

high-income taxpayers to pay little or no income tax.[5]  Section

---

[2].     In 1982, DuPont filed a consolidated federal income tax
return on behalf of itself and its affiliates, including Conoco,
Remington, and E.I. du Pont de Nemours & Company, as successor to
NEN.  Conoco, Remington, and NEN were not affiliates of DuPont
for the taxable years covered by the 1979-81 returns, however,
and each entity therefore filed its own return.  Furthermore,
while DuPont and Conoco filed tax returns on behalf of their
affiliated corporations, we will refer to the tax returns as
having been filed by DuPont and Conoco.

[3].     The law relevant to this appeal changed significantly
in 1986.  See infra note 38.  Unless otherwise noted, citations
to former I.R.C. §§ 56 and 58(h) will be to the 1982 version of
the Internal Revenue Code, 26 U.S.C.

[4].     DuPont, for itself and as successor to NEN, and
Remington filed this appeal.  Conoco, which has its principal
place of business in Texas, has an appeal pending before the
Court of Appeals for the Fifth Circuit.  Conoco, Inc. v.
Commissioner, No. 94-40382.

[5].     See H.R. Rep. No. 413, 91st Cong., 1st. Sess., pt. 1,
at 2 (1969), reprinted in 1969 U.S.C.C.A.N. 1645, 1646 ("Under

56(a) imposed a minimum tax, apart from the regular income tax, on certain deductions and exemptions designated as "items of tax preference."[6] During the years relevant to this case, the statute levied a minimum tax of 15% of the amount by which the

(..continued)
your committee's bill, virtually no individual with significant amounts of income will be able to escape payment of all tax. . . .  The second line of defense is to group remaining tax preference items and impose a minimum tax or a limit on tax preferences."); S. Rep. No. 552, 91st Cong., 1st Sess. 112 (1969), reprinted in 1969 U.S.C.C.A.N. 2027, 2143 ("the committee believes that an overall minimum tax on tax preferences is also needed to reduce the advantages derived from these preferences and to make sure that those receiving such preferences also pay a share of the tax burden").  See also First Chicago Corp. v. Commissioner, 842 F.2d 180, 181 (7th Cir. 1988) ("The purpose of minimum tax (original or alternative) is to make sure that the aggregating of tax-preference items does not result in the taxpayer's paying a shockingly low percentage of his income as tax."); Occidental Petroleum Corp. v. United States, 685 F.2d 1346, 1350 (Cl. Ct. 1982) (Occidental I) ("The legislative history, to us, reflects a Congressional concern for the way the tax code is perceived by the general public. . . .  In order to prevent the system from seeming inequitable, individuals and corporations with large incomes should not be able to avoid entirely the payment of domestic taxes.").

[6].        Items of tax preference, defined in I.R.C. § 57 (1982), represented:

> income of a person which either is not
> subject to current taxation by reason of
> temporary exclusion (such as stock options)
> or by reason of an acceleration of deductions
> (such as accelerated depreciation) or is
> sheltered from full taxation by reason of
> certain deductions (such as percentage
> depletion) or by reason of a special rate of
> tax (such as the rate of tax on corporate
> capital gains).

T.D. 7564, 1978-2 C.B. 19, 23.  Tax preferences continue to be defined in the current Internal Revenue Code, albeit in modified form.  I.R.C. § 57 (1988 & Supp. 1994).

taxpayer's preferences exceeded its regular tax deduction[7] or $10,000, whichever was greater.

In some situations, however, tax preferences did not result in a current tax benefit for the taxpayer. For example, a taxpayer's tax liability could be completely offset by income tax credits, which were not designated as preferences. Yet, even in those cases in which tax preferences did not result in an actual benefit, such as when a taxpayer had enough tax credits to reduce its tax liability to zero, the minimum tax still was imposed. See Occidental Petroleum Corp. v. United States, 685 F.2d 1346 (Cl. Ct. 1982) (Occidental I).

To remedy this perceived unfairness, Congress enacted a new provision, I.R.C. § 58(h), in the Tax Reform Act of 1976, Pub. L. No. 94-455, § 301(d)(3), 90 Stat. 1520, 1553 (1976).[8] I.R.C. § 58(h) provided:

---

[7]. The "regular tax deduction" equaled income tax liability, including investment tax credit recapture, reduced by certain tax credits. I.R.C. § 56(c).

[8]. The Joint Committee on Taxation explained the reason for § 58(h):

> There are certain cases in which a person derives no tax benefit from an item of tax preference because, for example, the item is disallowed as a deduction under other provisions of the Code or because the taxpayer has sufficient deductions relating to nonpreference items to eliminate his taxable income. . . . To deal with this problem specifically, the Act instructs the Secretary of the Treasury to prescribe regulations under which items of tax preference (of both individuals and corporations) are to be properly adjusted when the taxpayer does not derive any tax

**Regulations to include tax benefit rule**
      The Secretary shall prescribe
regulations under which items of tax
preference shall be properly adjusted where
the tax treatment giving rise to such items
will not result in the reduction of the
taxpayer's tax under this subtitle for any
taxable years.

Despite the express statutory directive, the Department of the

Treasury failed to propose implementing regulations for thirteen

years.[9]  In the meantime, Congress repealed § 58(h) in 1986 and

adopted an alternative minimum tax,[10] although it later noted

(..continued)
            benefit from the preference.  For this
            purpose, a tax benefit includes tax deferral,
            even if only for one year.

H.R. Rep. No. 10612, 94th Cong., 2d Sess., at 106-07 (1976)
(footnote omitted), reprinted in 1976-3 C.B. 118-19.  See also
First Chicago Corp., 842 F.2d at 181 ("[S]ection 56(a) would
impose minimum tax on tax-preference items even though the items
never conferred a tax benefit on the taxpayer. . . .  The sparse
legislative history as well as the text of section 58(h)
indicates that this section was added in order to prevent these
anomalous consequences."); Occidental Petroleum Corp. v.
Commissioner, 82 T.C. 819, 824 (T.C. 1984) (Occidental II)
("Plainly, in enacting section 58(h), Congress was concerned
about not imposing the minimum tax on tax preferences where such
tax preferences did not result in a tax benefit.").

[9].      Courts have noted the interpretative difficulties
caused by the Treasury's delay in issuing regulations under §
58(h).  See First Chicago Corp., 842 F.2d at 182 ("These and
other questions might have been answered if the Treasury
Department had ever gotten around to promulgating regulations
under section 58(h), as ordered to do by Congress, but it never
did, blaming its default on a staggering workload . . . .");
Occidental II, 82 T.C. at 829 ("[T]he failure to promulgate the
required regulations can hardly render the new provisions of
section 58(h) inoperative.  We must therefore do the best we can
with these new provisions.").

[10].      The Tax Reform Act of 1986 replaced the remnants of the
add-on minimum tax with an alternative minimum tax for taxable
years after 1986.  Tax Reform Act of 1986, Pub. L. No. 99-514, §

that § 58(h) would continue to apply to tax years preceding the 1986 statutory change.[11]

B.

In 1989, the Treasury Department issued a temporary regulation to implement § 58(h).[12] Three years later, the department promulgated a final version of the regulation, 26 C.F.R. § 1.58-9, applicable only to preferences arising in taxable years from 1977 to 1986, when the statute was in effect. Id. § 1.58-9(b). Under the regulation, as specified by § 58(h), a taxpayer is not liable for the minimum tax on its preferences when they result in no current tax benefit, such as when the taxpayer has sufficient credits to offset tax liability for the year without deducting any available preferences.

Operation of the statute and regulation, however, results in an unavoidable secondary effect. When tax credits exceed regular tax liability for a year, the taxpayer is deemed to have received no current tax benefit and no minimum tax is imposed. Yet, the taxpayer still calculates regular tax liability by deducting its preferences. Because the resulting regular tax liability is lower than it otherwise would be without

(..continued)
701, 100 Stat. 2085, 2320-45 (1986) (codified as amended at I.R.C. §§ 55-59 (1988)).

[11]. The Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, title VII, § 7811(d)(1)(B), 103 Stat. 2106, 2408 (1989), provided that: "The repeal of section 58(h) of the Internal Revenue Code of 1954 by the Tax Reform Act of 1986 shall be effective only with respect to items of tax preference arising in taxable years beginning after December 31, 1986."

[12]. Temp. Treas. Reg. § 1.58-9T (1989).

the inclusion of the preferences, fewer credits are necessary to offset the taxpayer's tax liability for the year.  Because tax credits may be carried over from year to year, the need for fewer tax credits to offset tax liability in one year "frees up" additional credits for use in other years.

If the taxpayer does not use those "freed-up" tax credits to reduce regular tax liability in any year, then it never benefits from the preferences; thus, no minimum tax may be imposed.  See Occidental Petroleum Corp. v. Commissioner, 82 T.C. 819 (T.C. 1984) (Occidental II).  If the taxpayer later uses those freed-up credits, however, then it has benefitted from the preferences and must pay the minimum tax.  Treas. Reg. § 1.58-9.  All parties agree with this conclusion.  The dispute centers on the method by which the minimum tax is calculated.

C.

For the 1982 tax year, DuPont filed a consolidated federal income tax return for itself and its affiliates -- including Conoco, Remington, and NEN -- showing taxable income of $629,112,639. DuPont claimed tax preferences of $177,082,305, which reduced its tax liability to $256,844,566. Without the use of preferences to compute taxable income, DuPont's tax liability would have been $338,302,426.[13] Because DuPont had $469,997,179 in credits -- more than enough to offset the potential tax liability of $338,302,426 -- it was not subject to minimum tax for the year, pursuant to I.R.C. § 58(h). See First Chicago Corp. v. Commissioner, 842 F.2d 180 (7th Cir. 1988).

Nevertheless, because DuPont claimed the preferences in 1982 to reduce its taxable income and subsequent tax liability,[14] it saved $81,457,860[15] in credits for use in other years. DuPont carried back those freed-up credits and applied them to its own return for the 1979 tax year and to individual returns filed by

---

[13]. The $338,302,426 in potential tax liability is calculated by multiplying the $177,082,305 in preferences by the marginal tax rate of 46 percent from I.R.C. § 11(b)(5) (1982). The result, $81,457,860, is then added to the $256,844,566 in regular tax liability computed after deducting the preferences from taxable income.

[14]. After being offset by its tax credits, DuPont's zero tax liability actually increased to $5,626,409 because of the recapture of investment tax credits, which could not be offset by credits.

[15]. See supra note 13.

Conoco, Remington, and NEN, which were not affiliated at the time with DuPont.[16]

Under Treas. Reg. § 1.58-9, the minimum tax constitutes 15% of the difference between the taxpayer's tax preferences and its regular tax deduction for the year in which the preferences arose, here 1982.  The regulation requires that credits freed up by the preferences in one year must be reduced by the amount of the minimum tax before being carried over to other tax years. In this case, § 1.58-9 mandated that the freed-up DuPont credits of $81,457,860 be reduced by $25,633,133, which was 15% of the difference between the 1982 preferences of $177,082,305 and the 1982 regular tax deduction of $6,194,754.[17]

Because DuPont had not reduced the credits pursuant to the regulation, the Commissioner assessed the following deficiencies:

| Taxpayer | Taxable Year Ended | Deficiency |
|----------|--------------------|-----------:|
| DuPont | December 31, 1979 | $13,010,040 |
| Conoco | December 31, 1980 | 12,436,199 |
| Remington | January 31, 1980 | 78,698 |
| NEN | February 28, 1981 | 108,196 |
| | Total | $25,633,133 |

---

[16].    See supra note 2.  DuPont used the tax credits for the 1979 tax year, Conoco and Remington used the credits for the 1980 tax year, and NEN used them for the 1981 tax year.

[17].    The regular tax deduction in 1982 was $568,345 more than the investment tax credit recapture amount of $5,626,409. See supra note 14.  The difference resulted from I.R.C. § 56(c), which, in defining the regular tax deduction, excluded from offsetting tax credits the Tax Reduction Act Stock Ownership Plan (TRASOP) employee plan percentage, under I.R.C. § 46(a)(2)(E) (1982).

In contrast to the system mandated by the regulation, which the Tax Court characterized as the "suspended-tax method," taxpayers advocate a "suspended-preference approach." Du Pont, 102 T.C. at 6. In essence, taxpayers' method would suspend the preferences -- not the minimum tax -- and treat them as if they had arisen during the carry-over year, i.e., the year the freed-up credits are used. Those suspended preferences would be aggregated with other preferences arising in the carry-over year. The minimum tax then would equal 15% of the difference between the aggregated preferences and the regular tax deduction for the carry-over year. Under taxpayer's method, DuPont, Remington, and NEN would have no minimum tax liability, and the deficiency against Conoco would be reduced to $10,551,956[18] -- instead of the $25,633,133 total deficiency assessed under Treas. Reg. § 1.58-9.

Accordingly, taxpayers filed petitions in the Tax Court claiming the deficiencies were based on an invalid regulation. The Commissioner of Internal Revenue disagreed, and all parties submitted a fully stipulated record to the Tax Court, which upheld Treas. Reg. § 1.58-9 as a reasonable interpretation of the statute. Du Pont, 102 T.C. at 20-21. Taxpayers then appealed.[19]

The Tax Court had jurisdiction of the case under I.R.C. §§ 6214(a) and 7442 (1988). We have jurisdiction under I.R.C. §

---

[18]. For detailed calculations of the minimum tax under taxpayers' proposed system, see Du Pont, 102 T.C. at 7-8.

[19]. See supra note 4.

7482 (1988), and our review is plenary.  Pleasant Summit Land
Corp. v. Commissioner, 863 F.2d 263, 268 (3d Cir. 1988), cert.
denied, 493 U.S. 901 (1989).

II.

As an initial matter, we consider the judicial
deference to which the regulation is entitled.  Under Chevron
U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S.
837, 844 (1984), "legislative regulations are given controlling
weight unless they are arbitrary, capricious, or manifestly
contrary to the statute."  Taxpayers, however, contend that §
1.58-9 is not a "legislative" regulation entitled to deference
under Chevron.

Because the Treasury proposed the regulation thirteen
years after the statute's enactment and three years after its
repeal, taxpayers argue that § 1.58-9 is not a "legislative"
regulation issued under I.R.C. § 58(h), but merely an
"interpretative" one[20] under the department's general rule-making
authority.  See I.R.C. § 7805(a) (1988) ("the Secretary shall
prescribe all needful rules and regulations for the enforcement

---

[20].      In this context, "legislative regulations" are those
issued pursuant to a specific grant of congressional authority
"'to define a statutory term or prescribe a method of executing a
statutory provision,'" while "interpretative regulations" are
issued under the general grant of authority of I.R.C. § 7805(a).
See Armstrong World Indus., Inc. v. Commissioner, 974 F.2d 422,
430-31 (3d Cir. 1992) (quoting Rowan Cos. v. United States, 452
U.S. 247, 253 (1981)).  See also McKnight v. Commissioner, 7 F.3d
447, 450-51 (5th Cir. 1993); Gehl Co. v. Commissioner, 795 F.2d
1324, 1328 (7th Cir. 1986).

of this title").[21]  We cannot agree.  I.R.C. § 58(h) provided that the "Secretary shall prescribe regulations . . .," which appears to be precisely the type of "express delegation of authority to the agency" that Chevron contemplates.  467 U.S. at 843-44.  Although there may be situations in which substantial and prejudicial delay in exercising rule-making authority might alter the degree of deference accorded a regulation, we see no express prejudice here nor do we discern any other factors that would change the nature of our review.  In addition, even after the repeal of § 58(h), Congress expressly stated that the statute would remain effective for preferences arising in taxable years before 1987.[22]  Therefore, the congressional directive for the Treasury to "prescribe regulations" under § 58(h) remained in force as to those taxable years.

Furthermore, in the tax area, we are still required to treat regulations issued under a general grant of authority with broad deference, although to a somewhat lesser degree than when Congress has made a specific delegation of authority in a specific statute.[23]  As the Supreme Court has explained:

---

[21].	The preamble to Treas. Reg. § 1.58-9 states it was issued under the specific statute, I.R.C. § 58(h), and the general grant of authority of § 7805.  See T.D. 8416, 1992-1 C.B. 7, 7, 9.

[22].	See supra note 11.

[23].	See Polychrome Int'l Corp. v. Krigger, 5 F.3d 1522, 1544 n.53 (3d Cir. 1993) (noting, in discussing the Virgin Islands tax code, that courts "owe less deference to an interpretative regulation . . . than to one promulgated under a specific grant of authority"); Armstrong World Indus., 974 F.2d at 430 ("legislative regulations not promulgated under the general authority to 'prescribe all needful rules and

"Because Congress has delegated to the Commissioner the power to promulgate 'all needful rules and regulations for the enforcement of [the Internal Revenue Code],' 26 U.S.C. §7805(a), we must defer to his regulatory interpretations of the Code so long as they are reasonable." Cottage Sav. Ass'n v. Commissioner, 499 U.S. 554, 560-61 (1991) (quoting National Muffler Dealers Ass'n v. United States, 440 U.S. 472, 476-77 (1979)).[24]

### III.

### A.

(..continued)
regulations,' 26 U.S.C. § 7805(a), but instead emanating from a specific grant of Congressional authority 'to define a statutory term or prescribe a method of executing a statutory provision,' are owed an even greater deference") (quoting Rowan Cos., 452 U.S. at 253). See also United States v. Vogel Fertilizer Co., 455 U.S. 16, 24 (1982); McKnight, 7 F.3d at 450-51; Gehl Co., 795 F.2d at 1328.

Although this court and others have noted that interpretative regulations issued under the Internal Revenue Code are entitled to less deference than legislative regulations, it is not clear whether this rule applies outside the Internal Revenue Code. So far we have declined to decide whether Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), which advises judicial deference to agency regulations, overruled General Electric Co. v. Gilbert, 429 U.S. 125, 141-42 (1976), which held that an agency's interpretative decisions required less judicial deference. See Sekula v. Federal Deposit Ins. Corp., No. 93-3596, 1994 WL 620836, at *8 n.13 (3d Cir. Nov. 9, 1994); Reich v. Local 30, Int'l Bhd. of Teamsters, 6 F.3d 978, 987 n.14 (3d Cir. 1993); International Raw Materials, Ltd. v. Stauffer Chem. Co., 978 F.2d 1318, 1325 n.9 (3d Cir. 1992), cert. denied, 113 S.Ct. 1588 (1993).

[24]. See also Commissioner v. Portland Cement Co. of Utah, 450 U.S. 156, 169 (1981) (citations omitted) ("Treasury Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes'"); Armstrong World Indus., 974 F.2d at 430 (citations omitted) ("we defer to treasury regulations that 'implement the congressional mandate in some reasonable manner'").

I.R.C. § 58(h) directs the Treasury to enact regulations "under which items of tax preference shall be properly adjusted where the tax treatment giving rise to such items will not result in the reduction of the taxpayer's tax under this subtitle for any taxable years." On appeal, taxpayers' principal contention is that the regulation adjusts tax credits, not items of tax preference.

Although § 58(h) requires that taxpayers be exempt from the minimum tax for any year in which their preferences do not result in a tax benefit, the regulation nevertheless computes the minimum tax that otherwise would be due on those preferences for the year. The regulation then reduces the taxpayers' tax credits by the amount of the minimum tax. It is only when taxpayers attempt to benefit from their preferences -- by using the freed-up credits -- that they become subject to the tax.

Taxpayers complain that the operation of § 1.58-9 results in adjustments to their tax credits, contrary to the language of the statute. Instead, taxpayers claim the tax should be assessed by carrying the preference items from the "non-benefit" year over to the "benefit" year and combining them with the preferences that arose during the latter year. The minimum tax then would equal 15% of the total number of preferences from both years subtracted by the benefit year's regular tax deduction. Taxpayers contend this method would adjust actual "items of tax preference," as the statute required.

Although taxpayers' proposal appears to be reasonable, it is not the only permissible construction of the statute, nor

is it necessarily the most reasonable one.[25]  We believe Treas.
Reg. § 1.58-9 adjusts "items of tax preference" simply by
ignoring them -- for minimum tax purposes -- during the year when
no tax benefit is realized.  As we have noted, the purpose of the
statute was to ensure that no minimum tax be assessed on
preferences when they did not result in a tax benefit;[26] Treas.
Reg. § 1.58-9 accomplishes this result.

B.

Taxpayers contend Congress intended a "suspended-
preference approach" be promulgated to implement I.R.C. § 58(h)
and claim the legislative history of the 1976 Tax Reform Act,
which adopted § 58(h), supports their construction of the
statute.  But none of the congressional committee reports on §
58(h) indicates the method by which the preferences were to be
adjusted.[27]  Nevertheless, taxpayers point to one committee
report discussing other provisions of the Code that specify a
type of suspension and reactivation of preferences somewhat

---

[25].      The Commissioner claims the taxpayers' approach would
violate fundamental principles of the Internal Revenue Code by
permitting deductions to be shifted from one tax year to another.
Taxpayers respond that they would adjust preferences only for
minimum tax purposes, not under the regular tax, and thus the
integrity of the Code would remain intact.  Because we find the
Treasury regulation to be a reasonable construction of the
statute, we need not resolve this issue.

[26].      See supra note 8.

[27].      See, e.g., S. Rep. No. 938, 94th Cong., 2d Sess., pt.
I, at 113-14 (1976), reprinted in 1976 U.S.C.C.A.N. 3439, 3548-
49; H.R. Rep. No. 658, 94th Cong., 2d Sess. 130-32 (1975),
reprinted in 1976 U.S.C.C.A.N. 2897, 3025-27.

similar to the system they advocate.[28]  That committee report, however, does not explicitly support taxpayers' method of tax computation.  Furthermore, as the Commissioner contends, the cited Code provisions are not analogous because they suspend tax deductions for other purposes,[29] not just for minimum tax purposes, as does § 58(h).[30]

---

[28].    The Joint Committee on Taxation Staff General Explanation of the Tax Reform Act of 1976 stated:

> There are certain cases in which a person derives no tax benefit from an item of tax preference because, for example, the item is disallowed as a deduction under other provisions of the Code or because the taxpayer has sufficient deductions relating to nonpreference items to eliminate his taxable income.1

---

> 1For example, preference items giving rise to losses which are suspended under at risk provisions (sec. 465 or sec. 704(d) of the Code) are not to be considered to give rise to a tax benefit until the year in which the suspended deduction is allowed.  Similarly, investment interest which is disallowed (under sec. 163(d)) is to be treated as an itemized deduction for purposes of that preference only in the year in which it is allowed (under sec. 163(d)).

H.R. Rep. No. 10612, 94th Cong., 2d Sess., at 106–07 (1976) (footnote omitted), reprinted in 1976–3 C.B. 118–19.

[29].    See I.R.C. §§ 465, 704(d), 163(d) (1976).

[30].    Taxpayers also contend the regulation is contrary to legislative intent because it was issued after Congress failed to include in a 1989 statute a proposal to permit the Treasury to adjust items other than tax preferences, presumably including tax credits.  In excluding this language from the final bill, however, the Conference Report noted the omission was not intended to affect the pending temporary Treasury regulation, which was later largely adopted as Treas. Reg. § 1.58-9:

Taxpayers also assert that Treas. Reg. § 1.58-9 distorts congressional will by interfering with the operation of other provisions of the Internal Revenue Code.  First, taxpayers claim the regulation disregards the import of the regular tax deduction in calculating and reducing minimum tax liability under I.R.C. § 56(a), (c).  Because Treas. Reg. § 1.58-9 "transforms a suspended minimum tax in the year the nonbeneficial preferences arise into regular tax liability in the benefit year," Du Pont, 102 T.C. at 15-16, the preferences from the non-benefit year are not being weighed against the regular tax deduction in the year they result in a benefit.  Yet, under the regulation, the preferences from the non-benefit year continue to be weighed against the regular tax deduction in the non-benefit year in calculating the amount of the suspended tax.  Furthermore, while the regular tax deduction appears to be an integral part of the minimum tax computation system of § 56, we can discern no

(..continued)

> The conferees do not intend any change
> in the scope of the authority provided in
> section 58(h) of prior law.  Thus, only those
> regulations which would have been valid under
> section 58(h) of prior law are valid under
> the conference agreement.  No inference is
> intended as to whether the regulations issued
> by the Treasury Department are valid under
> section 58(h) or prior law.

H.R. Conf. Rep. No. 386, 101st Cong., 1st Sess. 664-65 (1989), reprinted in 1989 U.S.C.C.A.N. 3018, 3267-68.  Thus, Congress's failure to approve the language cited above should not affect our determination as to the validity of the regulation.

authority or evidence the regular tax deduction was meant to play a crucial role in the tax benefit rule of § 58(h).

Second, because Treas. Reg. § 1.58-9 operates to reduce tax credits available for use in other years, taxpayers contend the regulation improperly interferes with Code provisions governing tax credits and the regular income tax. Although the regulation does affect tax credits, it does so only in limited circumstances to certain taxpayers, as the Tax Court noted. Du Pont, 102 T.C. at 19. There is no authority suggesting the minimal effects of the regulation will disrupt the entire system of tax credits crafted by Congress or that Congress intended to forbid all regulations that affect tax credits in any manner.[31]

Taxpayers urge us to look to other provisions of the Internal Revenue Code for guidance in considering the validity of Treas. Reg. § 1.58-9. Accordingly, we have examined I.R.C. § 56(b), which until 1987 provided for deferral of minimum tax liability in situations involving net operating losses affected by preferences. Under § 56(b), if preferences served to increase a net operating loss in one year, the minimum tax otherwise due on the preferences under § 56(a) was suspended until the year the preferences provided a tax benefit. The amount of the minimum

---

[31]. Taxpayers also complain that the regulation affects the balance between the regular tax and minimum tax provisions created by 1982 and 1984 congressional amendments to the Internal Revenue Code that scaled back certain preferences by specified percentages. See Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, 1982 U.S.C.C.A.N. (96 Stat. 324); Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 68(a), 98 Stat. 494, 588 (1984). We do not believe § 1.58-9 will interfere with the operation of these statutory changes.

tax imposed on the preferences in this situation was calculated with reference to the minimum tax rate and the regular tax deduction for the <u>year in which the preferences originated</u> -- similar to the manner in which § 1.58-9 operates.  <u>Du Pont</u>, 102 T.C. at 17-18.  We agree with the Tax Court that § 56(b) generally supports the rationale of Treas. Reg. § 1.58-9.  <u>Id.</u> at 18.

Therefore, we find nothing in the legislative history or inferentially from other sections of the Internal Revenue Code that would indicate the Treasury deviated from the language or purpose of the statute.  What is clear is the language of § 58(h) that directs the Secretary to "prescribe regulations under which items of tax preference shall be properly adjusted."  Congress made a specific delegation of authority to the Secretary to promulgate regulations, and we may not substitute an alternative construction of the statute unless the regulation contravenes the language or purpose of the statute,[32] which this regulation does not do.

---

[32]. See <u>supra</u> section II.

C.

Since 1976, when I.R.C. § 58(h) was enacted, other courts have considered its meaning and scope.[33] Although no prior cases directly confronted the validity of Treas. Reg. § 1.58-9, taxpayers contend their position here is bolstered by the reasoning of First Chicago Corp. v. Commissioner, 842 F.2d 180 (7th Cir. 1988). In First Chicago, the taxpayer had credits exceeding its tax liability for the 1980 and 1981 tax years. The Internal Revenue Service, however, decreed First Chicago should pay the minimum tax for those years on the preferences it used to reduce its tax liability, because those preferences freed up tax credits that might have been used to reduce First Chicago's

---

[33]. For example, in Occidental Petroleum Corp. v. United States, 685 F.2d 1346 (Cl. Ct. 1982) (Occidental I), the Court of Claims considered the propriety of the minimum tax for the years before Congress enacted the tax benefit rule of § 58(h). The court held the minimum tax was imposed regardless of whether the preferences actually resulted in a tax benefit. The court also determined that the provisions of § 58(h) should not be applied retroactively to cover the years 1970-71. In Occidental Petroleum Corp. v. Commissioner, 82 T.C. 819 (T.C. 1984) (Occidental II), the taxpayer's tax credits exceeded its tax liability for 1977, although it used its tax preferences to reduce the number of credits needed to offset that tax liability -- just as DuPont did in 1982. In Occidental II, however, the taxpayer never used the tax credits freed up by the preferences; instead, the credits expired unused. Nevertheless, the Commissioner attempted to impose the minimum tax on the taxpayer because, as in the present case, the taxpayer's use of the preferences did provide a benefit in the form of increased available credits for use in other years -- even if those credits later expired unused. The court rejected the Commissioner's argument and held that the provisions of § 58(h) meant "no minimum tax is to be imposed where the tax preference does not result in a decrease of tax not only for the year under consideration (here 1977) but also for any other year." Id. at 828.

future tax liability.  The Court of Appeals for the Seventh

Circuit disagreed, affirming the Tax Court's holding that "there

is no minimum tax on tax-preference items until the items confer

an actual benefit on the taxpayer."  Id. at 180.[34]

In the course of its discussion, the Seventh Circuit

noted:
> It is true that, as a result of Congress's
> extreme restlessness in the area of tax law,
> by the time the benefit is obtained the
> structure of taxation may have changed and
> the taxpayer may escape part or even all of
> the tax.  But this instability is built into
> tax law.  If a taxpayer is able to defer
> income to a year when tax rates are lower, he
> obtains a tax savings analogous to what First
> Chicago may someday obtain if its tax-
> preference items yield a tax benefit which
> gives rise to a minimum-tax liability that it
> can offset with foreign or investment tax
> credits, thanks to the new alternative
> minimum tax.  But the deferral may backfire,
> if the structure of taxation changes against
> the taxpayer.

Id. at 183.  This language suggests the court may have assumed

that if the 1980-81 preferences generated a tax benefit after the

1986 statutory changes, then they would be treated as preferences

in that later year and be subject to the new alternative minimum

tax, a view of § 58(h) advocated by taxpayers here.

But such assumptions, even if indicative of the court's

view, cannot be persuasive here.  At the time of the decision in

First Chicago, § 1.58-9 had not been promulgated.  In fact, the

---

[34].     Although the Seventh Circuit rejected the Treasury's
position, the preamble to § 1.58-9 notes the regulation is
"[c]onsistent" with the holding of First Chicago Corp.  See T.D.
8416, 1992-1 C.B. 7, 8.

court decried the absence of a regulation as contributing to the difficulties in interpreting § 58(h).[35]  Once the Treasury Department adopted the regulation pursuant to § 58(h), the landscape changed.  Instead of choosing among alternative methods of interpreting the statute, we must inquire whether the Treasury regulation reasonably implements the statute.[36]  As we have noted, we believe it does.

D.

Besides challenging the substance of Treas. Reg. § 1.58-9, taxpayers assert the regulation was enacted in "bad faith" and thus not entitled to judicial deference.  In support, taxpayers cite National Muffler Dealers Ass'n v. United States, 440 U.S. 472 (1979).  In National Muffler, the Supreme Court stated, in assessing the validity of regulations, courts should consider factors such as whether the regulation was issued contemporaneously with the statute, the manner in which it evolved, "the length of time the regulation has been in effect, the reliance placed on it, the consistency of the Commissioner's interpretation, and the degree of scrutiny Congress has devoted to the regulation during subsequent re-enactments of the statute."  Id. at 477.  Taxpayers argue the National Muffler factors demonstrate the regulation should be set aside.  Although

---

[35].     First Chicago Corp., 842 F.2d at 182 ("These and other questions might have been answered if the Treasury Department had ever gotten around to promulgating regulations under section 58(h), as ordered to do by Congress, but it never did . . . .").

[36].     See supra section II.

application of the National Muffler factors may not explicitly validate § 1.58-9, we do not find that sufficient to warrant striking down the regulation.[37]  In fact, we already have determined the regulation implements the statute in a "reasonable manner," which is all National Muffler ultimately requires and which is what its factors were intended to ascertain.  Id. at 476-77 (noting that courts should defer to regulations that "implement the congressional mandate in some reasonable manner" and listing factors to "determin[e] whether a particular regulation carries out the congressional mandate in a proper manner").

Taxpayers also assert the regulation is not entitled to deference because the Treasury Department promulgated it in an

_____

[37].      Indeed, in National Muffler, the Treasury waited six years after the statute was enacted to issue any regulation and then substantially changed its own regulation ten years after that.  440 U.S. at 478-82.  Nevertheless, the Supreme Court deferred to the regulation.  Id. at 488-89.

We are not persuaded that the National Muffler factors favor taxpayers' position here.  Although the regulation was not issued contemporaneously with the statute nor been long in place, taxpayers have not shown they detrimentally relied on any prior understanding of the statute.  The Commissioner's interpretation of the statute apparently has changed primarily because of judicial decisions such as Occidental II, 82 T.C. 819 (T.C. 1984), and First Chicago Corp., 842 F.2d at 180.  See T.D. 8416, 1992-1 C.B. 7, 8 (noting that Treas. Reg. § 1.58-9 is "[c]onsistent" with the holding of First Chicago).  Furthermore, although Congress may not have re-enacted the statute, it expressly noted the statute would continue to apply to the years preceding the repeal of § 58(h).  See supra note 11.  Finally, National Muffler involved an interpretative regulation issued under the general grant of authority of I.R.C. § 7805(a), rather than a regulation issued pursuant to a specific statutory mandate.  In view of this, the National Muffler analysis is somewhat less helpful.

attempt to circumvent the 1986 change in the revenue statutes that permitted up to 90% of the minimum tax to be offset by foreign tax credits.[38]  In addition, taxpayers claim the Treasury adopted § 1.58-9 merely to enhance its litigating stance in cases like this.

As to the claim the regulation was enacted merely to bolster the Treasury's litigating position, one court has ruled that "the Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of a litigation for the purpose of providing himself with a defense based on the presumption of validity accorded to such regulations."  Chock Full O' Nuts Corp. v. United States, 453 F.2d 300, 303 (2d Cir. 1971).  Yet, as the Court of Appeals for the Fifth Circuit noted, "[n]o case has held that the Secretary abused his discretion to promulgate retroactive regulations merely because the regulation at issue affected a legal matter pending before a court at the time the regulation was adopted."  Anderson, Clayton & Co. v. United States, 562 F.2d 972, 980 (5th Cir. 1977), cert. denied, 436 U.S. 944 (1978).  In the present case, there is no claim that any specific case was pending at the time the regulation was proposed.  Furthermore, taxpayers cite to

---

[38].     The Tax Reform Act of 1986 replaced the add-on minimum tax for corporations with an alternative minimum tax for taxable years after 1986.  Tax Reform Act of 1986, Pub. L. No. 99-514, § 701, 100 Stat. 2085, 2320-45 (1986) (codified as amended at I.R.C. §§ 55-59 (1988)).  Under the old system, foreign tax credits could not be used to offset the minimum tax.  Under the new alternative minimum tax, foreign tax credits are permitted to offset up to 90% of the tax.  See First Chicago Corp., 842 F.2d at 182; I.R.C. § 55, 59(a)(2) (1988 & Supp. 1994).

nothing in the record to support any of their suspicions regarding the Treasury Department's motives in promulgating the regulation, and the case was submitted to the Tax Court fully stipulated. DuPont, 102 T.C. at 2.

                                 IV.

In evaluating Treas. Reg. § 1.58-9, we are mindful of the Supreme Court's admonition: "The choice among reasonable interpretations [of the Internal Revenue Code] is for the Commissioner, not the courts." Skinner v. Mid-America Pipeline, 490 U.S. 212, 222 (1989) (quoting National Muffler Dealers Ass'n v. United States, 440 U.S. 472, 488 (1979)). After considering the regulation in light of the language of I.R.C. § 58(h), and the purpose behind it, we are satisfied § 1.58-9 constitutes a reasonable interpretation of the statute. Accordingly, we will affirm the judgment of the Tax Court.